LUECKEL, Administrator, Appellant, vs. PRESTON, Respondent.

*September 16—October 7, 1913.*

*Master and servant: Negligence: Death of servant: Direction of verdict.*

In an action for the death of plaintiff's intestate, who was caught and crushed between two loaded wagons, one of which he had just guided into defendant's storage building, it is *held* upon the evidence (stated in the opinion) that a verdict for the defendant was properly directed, no negligence upon his part being shown and the dangers of employment, if any, being as apparent to the deceased as to the defendant.

APPEAL from a judgment of the circuit court for Brown county: S. D. HASTINGS, Circuit Judge. *Affirmed.*

*Francis S. Bradford,* for the appellant.

For the respondent there was a brief signed by *A. M. Spencer,* attorney, and *P. H. Martin,* of counsel, and oral argument by *Mr. Martin.*

KERWIN, J. This action was brought to recover damages occasioned by the death of plaintiff's intestate. The court below directed a verdict for the defendant, and plaintiff appealed.

The evidence shows without substantial dispute that the defendant was at the time of the injury engaged in storing cabbage in a storage building, and that the deceased, William Weiland, was in his employ. Two wagons were used, each twelve feet eight inches long, with racks five feet wide at the top. The storage building was about thirty-two feet long and twenty-one feet wide, inside measurements. There was a driveway seven feet three inches wide running lengthwise the building from the east to the west end. There was a window in the west end two feet three inches from the ground and about five feet high and two feet three inches wide. There was also a window in either end of the attic two feet three inches wide and two feet eight inches high. The wall of the building was three feet thick. The wagons mentioned were drawn to the building loaded with cabbage, each wagon and load weighing two and one-half tons. One wagon had been drawn into the building and the tongue extended through the window at the west end, the front end of the rack being within about a foot of the window. The loaded wagons were drawn into the building by means of a rope sixty-five feet long attached to the tongue and extending over the driveway and through the window at the west end, the team of horses attached being at the west end of the building. In drawing in the second wagon a rope was attached to the tongue at the evener pin, run through the driveway under the first wagon, out through the west window, and attached to the evener to which the horses were hitched. The defend-

ant was at the east end of the building, where the wagon was being drawn in, and gave command to the driver of the team as to the starting of the horses as occasion required. The driveway inside was on a level with the ground outside, except that the sill of the doorway extended about two inches above the ground. The second wagon stood about twenty to twenty-five feet from the door of the building. After the horses were started and when the front wheels were about two feet from the door, the deceased hollered "whoa," and the horses immediately stopped, the deceased having hold of the tongue guiding the wagon into the driveway.

The defendant testified that when the wagon stopped he took a piece of pole and put it under the hub to start the wheel, to protect the rope, as there was a little rise in the ground at that point, and that the wheels sunk in some; that defendant directed deceased to take hold of the tongue and guide the wagon in, and when the front wheels were over the sill to step out from between the wagons; that when the front wheels were on the door sill the front end of the rack was about eighteen to twenty feet from the rear end of the rack on the first wagon, and when the hind wheels were over the sill there was a space of about eight or nine feet between the rear end of the rack on the first wagon and the front end of the rack on the rear wagon; that deceased hollered "whoa" when the front wheels were about two feet from the sill, because he thought the wagon was going to hit the door; that the defendant gave the command for starting the horses; that the horses stopped promptly when commanded to stop; that the second wagon was drawn in before the first was unloaded, to protect the cabbage from rain; that the driveway in the building was level and hard and made of clay and gravel; that there were planks run on either side of the driveway six inches above the ground and posts standing upright held by timbers at the top extending from plate to plate.

The evidence further shows that one O'Brien and defendant were behind the wagon, and when it was started the second time they pushed in order to help the wagon in and over the sill and the wagon went straight in. The deceased was caught between the front end of the second wagon and the rear end of the first, his head being slightly crushed between the racks, being in a stooping position when found. The space on either side of the passageway was covered by a floor six inches above the driveway and was vacant. When the second wagon load was drawn in the tongue was permitted to pass under the first wagon in order to permit the loads to come close together. The cabbage racks were longer than the wagons, that on the first being twelve feet eight inches, and that on the second about fourteen feet. When deceased was found he was standing outside of the wagon stooping over, with the racks caught on each side of his head, his hat being to the right of him and under the second wagon.

The evidence further shows that the injury occurred about 2 o'clock in the afternoon, and that there was sufficient light in the storage building where deceased was at work; that the team used in drawing in the load was gentle and was stopped when the hind wheels passed over the door sill so the wagon passed forward to the first load of its own momentum; that deceased, when asked to guide the tongue, said he could do it all right, and there was nothing to prevent him from stepping out from between the wagons when the hind wheels had passed over the sill; that the team drew the load in easily. It was not necessary to guide the tongue after the front wheels passed over the sill, and when the pull stopped the tongue would drop down and run along straight under the first wagon.

It was admitted in the case that the defendant never elected to come under ch. 50, Laws of 1911.

The claim of negligence is that defendant failed to furnish a safe place to work, a safe way to do the work, or safe ap-

pliances, and failed to warn deceased of the dangers of the work.

The court below directed a verdict on the ground that the evidence showed no negligence and that the dangers, if any, were as apparent to deceased as to the defendant; that the evidence showed nothing but an unfortunate accident, not resulting from any negligence on the part of the defendant.

We are fully convinced, after a careful examination of the evidence, that the trial judge was right in directing a verdict. The operation of storing the cabbage was very simple; the team and wagons were suitable and proper for the work; the driveway was in good condition and the building properly constructed, with ample opportunity to guide the tongue and step aside when the wagon passed over the sill. The driveway on the inside being practically on a level with the approach to the door on the outside, the only rise being a two-inch sill, the wagon when drawn in would naturally come to a stop very shortly after it passed over the sill after the team was stopped. There was nothing whatever in the operation difficult or dangerous. But it is claimed on the part of the appellant that the wagon should have been backed into the storage building and that there should have been a half hitch on the end of the wagon tongue. Whether the work could have been done practically or efficiently by backing in (a point upon which there is no testimony) we need not consider, if the way in which the work was done was as safe as the nature of the employment would reasonably permit.

As to whether there was a half hitch on the end of the tongue the evidence is conflicting. But conceding for the moment that the rope was attached at the evener pin, and no half hitch at the end of the tongue, still there was no danger so far as the evidence in the record shows. There is no evidence of injury because of the tongue dropping down or because of want of a half hitch. The deceased was instructed to let go of the tongue when the front wheels passed over the sill, and

it is clear that no injury would· have resulted from such operation; the tongue would have moved on under the first wagon until the wagon stopped.    There is no evidence that the deceased was injured or caught between the racks while he had hold of the tongue.    It is also clear from the evidence, as the court below held, that the deceased was as familiar with the situation as the ·defendant and needed no instructions respecting the work.

No negligence of the defendant having been shown, it is unnecessary to discuss the questions of assumption of risk and contributory negligence.    We are convinced that the judgment is right and should be affirmed.·

*By the Court.*—The judgment is affirmed.